No. 14-5195

NOT YET SCHEDULED FOR ORAL ARGUMENT

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

SCENIC AMERICA, INC.,

*Plaintiff-Appellant*,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,

*Defendants-Appellees*,

and

OUTDOOR ADVERTISING ASSOCIATION OF AMERICA, INC.,

*Intervenor-Appellee*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

**OPENING BRIEF FOR APPELLANT**

_____

Daniel H. Lutz
Hope M. Babcock
INSTITUTE FOR PUBLIC REPRESENTATION
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
(202) 662-9535
daniel.lutz@law.georgetown.edu

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

**A.     Parties.** The parties who appeared in the district court, and who are also parties in this Court, are:

1. Plaintiff-Appellant: Scenic America.

2. Defendants-Appellees: United States Department of Transportation; Anthony Foxx, Secretary of U.S. Department of Transportation; Federal Highway Administration; Gregory Nadeau, Acting Administrator of Federal Highway Administration.

3. Intervenor-Appellee: Outdoor Advertising Association of America.

4. There were no *amici* in the district court. As of the date of this filing, there are no *amici* in this Court.

**B.     Rulings under Review.** The sole ruling under review is the Memorandum Opinion and Order entered by the United States District Court for the District of Columbia on June 20, 2014, granting Defendants' and Intervenor's Motions for Summary Judgment and denying Plaintiff's Cross-Motion for Summary Judgment in case number 13-93. District Court Judge James Boasberg's June 20, 2014 opinion is available as *Scenic Am. v. U.S. Dept. of Transp.et al*., 2014 U.S. Dist. LEXIS 84129 (Jun. 20, 2014).

**C.     Related Cases.** Counsel for Scenic America are not aware of any related cases pending in this Court or any other court.

ii

## **Rule 26.1 Jurisdictional Statement**

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant Scenic America – a 501(c)(3) non-profit organization – states that it has no parent corporations or any publicly held corporations that own 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................vii

GLOSSARY ...........................................................................xiii

STATEMENT OF ISSUES ........................................................1

STATEMENT OF JURISDICTION .........................................1

STATUTES AND REGULATIONS..........................................2

STATEMENT OF FACTS ........................................................2

    I.     Statutory and Regulatory Background .......................2

    II.    FHWA's Actions Leading up to Plaintiff's Complaint .............4

    III.   Proceedings in the District Court ...............................8

SUMMARY OF ARGUMENT ................................................10

STANDARD OF REVIEW .....................................................12

ARGUMENT...........................................................................13

    I.     FHWA VIOLATED THE ADMINISTRATIVE
          PROCEDURE ACT BY ISSUING THE 2007
          GUIDANCE WITHOUT NOTICE AND AN
          OPPORTUNITY FOR COMMENT.........................................13

          A. The 2007 Guidance is Not an Interpretive Rule but is
             Instead a Legislative Rule. ...................................................14

                  1.     The 2007 Guidance is a legislative rule
                         because it establishes arbitrary numerical
                         regulatory standards that are not derived
                         from "interpreting" the statute or
                         previous regulations. ........................................17

iv

2.      The 2007 Guidance is a legislative rule
        because it restricts agency enforcement
        discretion. ........................................................22

3.      The 2007 Guidance is a legislative rule
        because it serves as the "legislative basis"
        for agency action. ............................................25

4.      The 2007 Guidance is a legislative rule
        because it "effectively amends a prior
        legislative rule" by granting new rights to
        private entities. .................................................29

B. Even if the 2007 Guidance Is Interpretive, It Still
   Required Notice-And-Comment Because It Amended
   Definitive Agency Interpretation. .........................................31

II.     FHWA VIOLATED THE HIGHWAY BEAUTIFICATION
        ACT BY CREATING LIGHTING STANDARDS THAT
        ARE NOT "CONSISTENT WITH CUSTOMARY USE" .......35

A. FHWA's 2007 Understanding of FSA Terms Misreads
   the HBA's "Customary Use" Requirement. ........................36

1.      The 2007 Guidance conflicts with the
        HBA's purpose. .................................................37

2.      The 2007 Guidance departs from the
        plain meaning of "customary use" ..................40

B. FHWA's Faulty Construction of the "Customary Use"
   Requirement Deserves No Deference. ..................................41

1.      FHWA is not entitled to *Auer* deference. .........42

2.      FHWA does not deserve *Chevron*
        deference. ...........................................................44

3.      The 2007 Guidance lacks the "power to
        persuade" .........................................................47

v

CONCLUSION..........................................................................................48

CERTIFICATE OF COMPLIANCE........................................................49

CERTIFICATE OF SERVICE..................................................................50

STATUTORY AND REGULATORY ADDENDUM .............................51

# TABLE OF AUTHORITIES

## Cases

\* *Alaska Professional Hunters Association v. Federal Aviation Administration*, 177 F.3d 1030 (D.C. Cir. 1999) ........................ 31

*Alaska v. United States Department of Transportation*, 868 F.2d 441 (D.C. Cir. 1989) ............................................................. 23, 24

*Allentown Mack Sales and Service v. National Labor Relations Board*, 522 U.S. 359 (1998) ........................................................ 35

\* *American Mining Congress v. Mine Safety and Health Administration*, 995 F.2d 1106 (D.C. Cir. 1993) ......... 16, 24, 30, 35

*Appalachian Power Company v. Environmental Protection Agency*, 208 F.3d 1015 (D.C. Cir. 2000) ..................... 15, 17, 34

*Asiana Airlines v. Federal Aviation Administration*, 134 F.3d 393 (D.C. Cir. 1998) .................................................................... 13

*Associated Builders and Contractors, Incorporated v. Reich*, 922 F. Supp. 676 (D.D.C. 1996) ................................................. 31

*Astrue v. Capato*, 132 S. Ct. 2021 (2012) ..................................................... 46

*Auer v. Robbins*, 519 U.S. 452 (1997) ............................................. 41, 42, 44

\* *Batterton v. Marshall*, 648 F.2d 694 (D.C. Cir. 1980) ........................ 22, 30

*Berlex Labs, Incorporated v. Food and Drug Administration*, 942 F.Supp. 19 (D.D.C. 1996) ................................................. 26

*Bowles v. Seminole Rock and Sand Company*,
325 U.S. 410 (1945)..................................................................... 42

*Bush v. Thoratec Corporation*,
13 F. Supp. 3d 554 (E.D. La. 2014) ........................................... 27

*Cabais v. Egger*, 690 F.2d 234 (D.C. Cir. 1982).......................... 30

\* *Catholic Health Initiatives v. Sebelius*,
617 F.3d 490 (D.C. Cir. 2010)......................... 16, 17, 18, 20, 21

*Central Texas Telephone Cooperative v. Federal Communications
Commission*, 402 F.3d 205 (D.C. Cir. 2005)................................ 19

*Christopher v. SmithKline Beecham Corporation*,
132 S. Ct. 2156 (2012)................................................................ 44

\* *Community Nutrition Institute v. Young*,
818 F.2d 943 (D.C. Cir. 1987)..................................... 16, 22, 24

*Electronic Privacy Information Center v. United States
Department of Homeland Security*, 653 F.3d 1 (D.C. Cir. 2011) ............. 14

*Fox v. Clinton*, 684 F.3d 67 (D.C. Cir. 2012)............................. 46

*General Motors Corporation v. Ruckelshaus*,
742 F.2d 1561 (D.C. Cir. 1984)................................................. 14

*Gonzalez v. Oregon*, 546 U.S. 243 (2006)................................... 45

*Health Insurance Association of America v. Shalala*,
23 F.3d 412 (D.C. Cir. 1994).................................................... 16

\* *Hoctor v. United States Department of Agriculture*,
82 F.3d 165 (7th Cir. 1996) ......................................... 18, 19, 20

*Khan v. Parsons Global Services, Limited*,
    428 F.3d 1079 (D.C. Cir. 2005)................................................................ 12

*Lewis-Mota v. Secretary of Labor*,
    469 F.2d 478 (2d Cir. 1972) ..................................................................... 25

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ..................................... 18

*Missouri Public Service Commission v. Federal Energy*
    *Regulatory Commission*, 215 F.3d 1 (D.C. Cir. 2000).............................. 20

*Mortgage Bankers Association v. Harris*,
    720 F.3d 966 (D.C. Cir. 2013), *cert. granted sub nom.*,
    *Perez v. Mort. Bankers Ass'n*, 134 S.Ct. 2820 (2014) .............................. 33

* *National Family Planning and Reproductive*
    *Health Association v. Sullivan*,
    979 F.2d 227 (D.C. Cir. 1992).......................................... 23, 25, 26, 29, 31

*New Jersey v. Environmental Protection Agency*,
    626 F.2d 1038 (D.C. Cir. 1980)................................................................ 13

*Northwest Environmental Defense Center v. Decker*,
    133 S. Ct. 1326 (2013)......................................................................... 42, 43

*Paralyzed Veterans of America v. D.C. Arena*,
    117 F.3d 579 (D.C. Cir. 1997).................................................................. 32

*Petit v. United States Department of Education*,
    675 F.3d 769 (D.C. Cir. 2012).................................................................. 29

*Pharmaceutical Research and Manufacturers of America v.*
    *United States Department of Health and Human Services*,
    2014 U.S. Dist. LEXIS 70894 (D.D.C. May 23, 2014) ........................... 16

*Scenic Arizona v. Phoenix Board of Adjustment*,
    268 P.3d 370 (Ariz. Ct. App. 2011) ....................................................... 6, 28

*Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87 (1995) .................... 46

*Skidmore v. Swift and Company*, 323 U.S. 134 (1944) ............................... 47

*Spirit of Sage Council v. Norton*,
    294 F. Supp. 2d 67 (D.D.C. 2003) ............................................... 22, 23, 31

*Steinhorst Associates v. Preston*,
    572 F. Supp. 2d 112 (D.D.C. 2008) ........................................................... 25

*Sturm, Ruger and Company v. Chao*,
    300 F.3d 867 (D.C. Cir. 2002) .................................................................. 12

*Syncor International Corporation v. Shalala*,
    127 F.3d 90 (D.C. Cir. 1997) .................................................................... 32

*Talk America, Incorporated v. Michigan Bell
Telephone Company*, 131 S. Ct. 2254 (2011) ........................................... 43

*Tijerina v. Walters*, 821 F.2d 789 (D.C. Cir. 1987) ................................... 40

* *United States v. Mead Corporation*, 533 U.S. 218 (2001) ............ 44, 46, 47

*Yale-New Haven Hospital v. Leavitt*,
    470 F.3d 71 (2d Cir. 2006) ....................................................................... 35

**Statutes**

* 23 U.S.C. § 131 ........................................ 1, 2, 11, 19, 36, 37, 41, 45, 48, 51

28 U.S.C. § 1291 ................................................................................... 1

28 U.S.C. § 1331 ................................................................................... 1

5 U.S.C. § 551 .................................................................................... 13

5 U.S.C. § 706 ................................................................... 35, 36, 41, 48

* 5 U.S.C. § 553 ................................................... 1, 2, 8, 13, 14, 19

Pub. L. 89-285, tit. III, § 303(a), 79 Stat. 1033 (1965) .................................. 3

## Other Authorities

11 Cong. Rec. S23, 891 (Sept. 15, 1965) ............................................. 2

111 Cong. Rec. H26, 295 (Oct. 7, 1965) ........................... 3, 37, 38, 43

124 Cong. Rec. S. 26917 (August 18, 1978) ................................. 4, 5

Brief for United States as Amici Curiae Supporting Petitioners,
    Reed v. Town of Gilbert, Arizona (U.S. 2014) (No. 13-502) .................. 37

Charles Floyd, *Billboard Control under the*
    *Highway Beautification Act—A Failure of Land Use Controls*,
    45 J. Am. Planning Ass'n 115 (1979) ....................................... 39

David Kunz, *Section 4(f): Analyzing Differing*
    *Interpretations and Examining Proposals for Reform*,
    31 J. Legis. 275 (2005) .............................................................. 37

*Hearings on H.R. 7797 Before the House Committee on*
    *Public Works*, 90th Cong. 960 (1967) ....................................... 3

Henry J. Friendly, *Watchman, What of the Night?*, *in*
   Benchmarks (1967)..................................................................... 17

*Implementation of Road Beauty Act Stirs Controversy*,
   Cong. Quarterly 711 (Apr. 1, 1966) ............................................. 3

Randy Kozel & Jeffrey Pojanowski, *Administrative Change*,
   59 UCLA L. Rev. 112 (2011)..................................................... 46

Robert Anthony, *"Interpretive" Rules, "Legislative" Rules and*
   *"Spurious" Rules: Lifting the Smog*, 8 Admin. L.J. 1 (1994)................... 14

Robert Anthony, *The Supreme Court and the APA:*
   *Sometimes They Just Don't Get It*, 10 Admin. L.J. Am. U. 1 (1996) ....... 43

Ronald Pierce, Jr., *Distinguishing Legislative Rules from*
   *Interpretative Rules*, 52 Admin L. Rev. 547 (2000) ................................ 15

Susan Sharpe, *Between Beauty and Beer Signs: Why Digital*
   *Billboards Violate the Letter and Spirit of the Highway*
   *Beautification Act of 1965*, 64 Rutgers L. Rev. 515 (2012)..................... 39

*Webster's New World College Dictionary* (4th ed. 2009)........................... 27

## Regulations

23 C.F.R. § 750.108.................................................................... 45

23 C.F.R. § 750.705(j) ............................................................... 4

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| CEVMS | Commercial Electronic Variable Message Signs |
| D.E. | Docket Entry |
| FHWA | Federal Highway Administration |
| FSA | Federal-State Agreement |
| HBA | Highway Beautification Act |
| JA | Joint Appendix |
| LED | Light Emitting Diode |
| OAAA | Outdoor Advertising Association of America |

## STATEMENT OF ISSUES

1. Whether the district court erred in ruling that the Federal Highway Administration ("FHWA") did not violate Section 553 of the Administrative Procedure Act, 5 U.S.C. § 553, when it issued a Guidance Memorandum that redefines the prohibition on "flashing," "intermittent," and "moving" lights to exclude digital billboards displaying rapidly changing lighted messages without following Section 553's required procedures.

2. Whether the district court erred in ruling that the Administration's Guidance Memorandum, which redefined the prohibition on "intermittent" lighting in a manner that allows digital billboards to change as rapidly as every four to ten seconds, was "consistent with customary use," as required by the Highway Beautification Act, 23 U.S.C. §131.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this case pursuant to 28 U.S.C. §1291, because it is an appeal from the United States District Court for the District of Columbia. The district court had jurisdiction over this action pursuant to 28 U.S.C. § 1331. The district court granted summary judgment for Defendants and Intervenor and denied summary judgment for Plaintiff on June 20, 2014. Plaintiff filed a timely notice of appeal on August 7, 2014.

1

## STATUTES AND REGULATIONS

Applicable statutes to this case are the Highway Beautification Act of 1965, 23 U.S.C. § 131, and the Administrative Procedure Act, 5 U.S.C. § 553, which are set forth in the Addendum to this brief.

## STATEMENT OF FACTS

### I. Statutory and Regulatory Background

In 1965, Congress passed the Highway Beautification Act ("HBA") to control "the erection and maintenance of outdoor advertising signs" along interstate highways in order "to promote the safety and recreational value of public travel, and to preserve natural beauty." 23 U.S.C. § 131(a). As Senator Dodd stated, Congress was concerned that "the creeping cancer of roadside advertising has made a huge and garish want-ad of many of our Nation's highways." 11 Cong. Rec. S23, 891 (Sept. 15, 1965).

To ensure "effective control" of outdoor advertising signs, Congress established a system in which the federal government could reduce highway funds to states that did not enter into Federal-State Agreements ("FSAs") with the federal government to regulate highway billboards. *Id*. § 131(b), (d). Through a deliberate amendment to the draft HBA, Congress directed that the FSAs contain lighting standards so that highway billboard lighting comported "with customary use." *Id*. § 131(d); *see also* 111 Cong. Rec. H26,

295 (Oct. 7, 1965) (Rep. Tuten amendment inserting "customary use"

language to size, lighting, and spacing regulation). After the HBA was

enacted, Congress held hearings in 1967 to determine what constituted

"customary use," during which FHWA Administrator Lowell K. Birdwell

testified that the "customary use" directive in the HBA was clearly meant to

extend to lighting regulations. *Hearings on H.R. 7797 Before the H. Comm.*

*On Public Works*, 90th Cong. 960-61 (1967). During those hearings, Rep.

Wright emphasized that "customary use" meant "that which is standard

practice." *Id*. Each state also held hearings to determine the appropriate

standards that would comport with "customary use." Pub. L. 89-285, tit. III,

§ 303(a), 79 Stat. 1033 (1965); *see Implementation of Road Beauty Act Stirs*

*Controversy*, Cong. Quarterly 711, 714 (Apr. 1, 1966).

Following the passage of the HBA, FHWA determined that

"customary use" must be interpreted "within the overall purposes of the act"

to preserve natural beauty and protect the public. FHWA 1966 Guidance at

4-5 (D.E. No. 28-1 at 46-47). Over the period of five years, the federal

government negotiated with the states to adopt regulations that would set

lighting standards to what was in customary use. *See* AR0489-1025. Forty-

five states subsequently entered into FSAs that defined "customary use" as

prohibiting billboards that display "flashing, intermittent, or moving lights."

*See id*. Any state that seeks to amend its own regulations of billboards placed along federal highways is required to obtain approval from FHWA to ensure that they are in compliance with the applicable FSA into which it has entered. 23 C.F.R. § 750.705(j). Thus, FHWA must ensure that states that have entered into FSAs that prohibit flashing, intermittent, and moving lights on highway billboards enforce these lighting regulations.[1]

## II. FHWA's Actions Leading up to Plaintiff's Complaint

In the years following the adoption of the FSAs, new electronic technologies began to appear on billboards along the Interstate Highway System. *See* 1990 FHWA Memorandum, JA 163. Signs employing these technologies are called Commercial Electronic Variable Message Signs ("CEVMS") because they "change their advertising messages by electronic process or remote control." *Id*. In 1978, Congress considered a proposed amendment to Section 131(d) to allow CEVMS, but various senators expressed "concern over any proliferation of these electronic signs off-premise," and the amendment did not pass. 124 Cong. Rec. S. 26917-18 (August 18, 1978) (statements of Senators Bentsen and Stafford). After confusion among the states regarding the permissibility of these new

---

[1] Throughout this brief, the FSA lighting regulations that prohibit "flashing, intermittent, or moving lights" are also referred to as "common lighting" prohibitions or standards.

4

technologies under the FSAs, FHWA issued a 1990 Guidance memorandum declaring that CEVMS are prohibited under individual FSAs, "irrespective of the method used to display the changing message." *Id.*

Throughout the 1990s, uncertainty arose as to whether billboards that changed messages mechanically by rotating panels ("tri-vision panels") violated FSA lighting standards. For example, in a 1990 letter to Intervenor, FHWA Administrator T. D. Larson adhered to the agency's stance that tri-vision panels were prohibited because they "create the effect of flashing or moving lights," and thus violate the FSAs. JA 164. However, FHWA Division chiefs, such as one from the Alabama Division, disagreed, finding that rotating tri-vision panels should be permitted under the applicable FSA. *See* 1991 FHWA Alabama Memorandum, JA 166. As various states began amending their laws to allow tri-vision billboards as consistent with their individual FSAs, FHWA issued a 1996 Guidance memorandum permitting the use of tri-vision billboards under the FSAs. JA 182. All the while FHWA was changing its position regarding unlighted rotating panels as a permissible form of billboard advertising, the agency never wavered on its view of billboards that emit light. The 1996 Guidance did not change FHWA's 1990 Guidance declaration that electronic lighting technology was prohibited as constituting a "flashing, intermittent, or moving light." *Id.*

5

As lighting technology advanced, industry began urging both federal and state governments to allow the construction of digital billboards.[2] FHWA Division offices began to diverge on the permissibility of digital billboards and whether they violate FSA lighting regulations. The Texas Division, for example, flatly prohibited digital billboards, finding that they contain flashing, intermittent, and moving lights. JA 263-64. The Indiana Division, on the other hand, permitted digital billboards—so long as each message remained static for several seconds. JA 422. Other Division offices, such as the New York Division, took a stance that followed the law, permitting digital billboards that change advertisements every twenty-four hours. JA 420. The variation between Division offices regarding the permissibility of digital billboards under FSA lighting regulations led the Mississippi Division to request that FHWA provide a clear statement on the issue. JA 448.

---

[2] "Digital billboards" contain light-emitting diode ("LED") technology to display electronic advertisements. Mem. Op., JA 83. LEDs are lighted bulbs that generate a range of color intensity. JA 427; *Scenic Ariz. v. Phoenix Bd. of Adjustment*, 268 P.3d 370, 372 n.1 (Ariz. Ct. App. 2011). Through the use of this technology, advertisements can be changed remotely by turning on and off numerous colored lights placed on the billboard. JA 428; *Scenic Ariz.*, 268 P.3d at 378 ("[B]ecause black light does not exist, any time the color black is part of an LED image, some of the LED lights have been turned off").

In determining how to respond to this request, FHWA struggled with
how to yield to the industry's lobby for digital billboards and permit them
under the FSAs. FHWA's Director of Project Development and
Environmental Review, Gerald Solomon, pushed to include Intervenor
Outdoor Advertising Association of America's ("OAAA") suggested timing
criteria in a guidance that would allow for digital billboards that displayed
messages for several seconds. JA 465. Yet other FHWA officials disagreed.
One official thought it was "as clear as night and day" that "illuminations
that go on or off more than once a day are intermittent lights." Aug. 28, 2007
Email from FHWA's Catherine O'Hara, JA 518. Another struggled with
"coming up with a clear way to define the term 'intermittent'." Sept. 24,
2007 Email from FHWA's Robert Black, JA 533 (expressing concern that
"any lawsuits might turn on that word").

Despite its hesitancy, FHWA capitulated to industry pressure and
decided to amend its 1990 Guidance regarding advertisements emitting light.
In its new 2007 Guidance, FHWA declared, for the first time, that digital
billboards that met certain timing criteria for changing advertisements, as
proposed by the billboard industry, do not contain "flashing, intermittent, or
moving" lights as those terms are used in the FSAs. JA 535. In issuing this
new rule, FHWA did not provide an opportunity for notice and public

7

comment as required by the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 553. The agency also did not provide an explanation as to why it selected the specific timing standards contained in the Guidance.

### III. Proceedings in the District Court

Appellant Scenic America ("Plaintiff" or "Appellant") challenged FHWA's 2007 Guidance in the District Court for the District of Columbia on the grounds that the agency failed to comply with both the APA and the HBA. Specifically, Scenic America contended that: 1) the 2007 Guidance was a legislative rule under the APA and thus requiring notice-and-comment prior to issuance; 2) the 2007 Guidance unilaterally created new lighting standards without agreement between the state and the federal government, which is required under the HBA; and 3) FHWA's pronouncement that the placement of digital billboards that rapidly change advertisements along federal highways did not comply with the HBA's directive to promulgate lighting standards consistent with "customary use." The Outdoor Advertising Association of America ("OAAA," or "Intervenor") intervened as a defendant.

The district court issued two opinions. In its first opinion, the district court denied FHWA's and Intervenor's motions to dismiss because Scenic America lacked standing and because the Guidance was not a final agency

action subject to judicial review. JA 62, 73. The court first determined that

Scenic America possessed organizational standing. Plaintiff demonstrated

that it suffered an injury-in-fact because it was deprived of the opportunity

to provide public comment, thereby incurring substantial additional costs in

opposing "the proliferation of digital billboards" and impairing the

organization's overall "effectiveness in combating billboard blight." JA 63.

Scenic America showed that FHWA caused the injuries to the organization

because the 2007 Guidance provided the basis for the spread of digital

billboards, which led to Scenic America's added costs of combating their

prevalence. JA 68. Scenic America also demonstrated that a favorable

judicial decision would redress its injuries. JA 71. The district court next

determined that the 2007 Guidance constituted final agency action subject to

judicial review because "it is clear that the agency 'has completed its

decision making process' at least as to whether digital billboards violate

FSA prohibitions," and because the 2007 Guidance has legal consequences

by binding the agency's enforcement discretion. JA 73-75.

        In its second opinion, the district court granted Defendants' and

Intervenor's motions for summary judgment and denied Plaintiff's cross

motion for summary judgment. Mem. Op., JA 80. The court held that the

2007 Guidance was an interpretive rule, not a legislative one, and thus is

exempt from the APA's notice-and-comment requirements. JA 82. The court also determined that because the 2007 Guidance was merely an interpretation of the FSAs, it was a permissible interpretation of the HBA's "customary use" requirement. JA 108. Plaintiff appeals the district court's grant of summary judgment to Defendants and Intervenor.

## SUMMARY OF ARGUMENT

*1.* The district court's ruling that FHWA's 2007 Guidance is an interpretive—rather than a legislative rule—is in error, and thus the rule required notice-and-comment prior to its issuance under the APA. In its analysis, the district court limited itself to a four-factor test set forth in *American Mining Congress v. Mine Safety and Health Administration* to determine if an agency rule is legislative or interpretive. By doing so, the district court both ignored other precedent to consider in the analysis and misapplied the *American Mining Congress* factors.

Specifically, the district court disregarded that when an agency creates arbitrary numeric standards that have no basis in the underlying statute or regulation, those standards constitute legislative rules that are subject to notice-and-comment. The district court similarly disregarded precedent that finds when an agency cabins its enforcement discretion, such as when FHWA bound itself from enforcing against digital billboards in its 2007

10

Guidance, the agency creates a legislative rule. Finally, the district court misapplied the *American Mining* factors: FHWA produced the "legislative basis" for agency action by issuing a rule that runs counter to its regulations, and FHWA effectively amended prior regulations by granting new rights to billboard owners to operate digital billboards that rapidly change lighted advertising messages.

*2.* The district court also erred in ruling that FHWA's 2007 Guidance was "consistent with" the HBA's "customary use" requirement for billboard lighting standards. 23 U.S.C. § 131(d). Each state, through hearings and a negotiated agreement with the federal government (*i.e.*, FSA), determined its "customary use" of highway billboard lighting; many FSAs determined that their jurisdiction's "customary use" prohibited "flashing, intermittent, or moving lights." FHWA's new 2007 interpretation of "flashing," "intermittent," or "moving" lights contravenes the HBA's purposes of preserving natural beauty and ensuring highway safety, altering FSA lighting standards to the point that they are no longer "consistent with customary use."

Furthermore, FHWA cannot claim that its 2007 Guidance interpretation of "customary use" is entitled to deference. FHWA does not deserve *Auer* deference because *Auer* is inapplicable in this context; even if

11

it were, the 2007 Guidance interpretations of the prohibition on "intermittent" and "flashing" are plainly erroneous and inconsistent with the FSAs. Second, FHWA's interpretation of "customary use" does not deserve *Chevron* deference because the 2007 Guidance was not the product of a notice-and-comment process and because the HBA does delegate authority to the agency to unilaterally interpret that term. Finally, the agency's interpretation does not deserve deference because it provides no reasoning or logic as to its interpretation, and thus lacks the "power to persuade".

As such, the 2007 Guidance violates both the HBA and APA by issuing a legislative rule without notice-and-comment and by creating lighting standards that are not "consistent with customary use," and it violates the APA by issuing such a rule.

## <u>STANDARD OF REVIEW</u>

This Court reviews a district court's grant of summary judgment *de novo*. *Khan v. Parsons Global Servs., Ltd.*, 428 F.3d 1079, 1082 (D.C. Cir. 2005). This Court also accepts all factual allegations as true. *Sturm, Ruger & Co., Inc. v. Chao*, 300 F.3d 867, 871 (D.C. Cir. 2002).

## ARGUMENT

### I. FHWA VIOLATED THE ADMINISTRATIVE PPROCEDURE ACT BY ISSUING THE 2007 GUIDANCE WITHOUT NOTICE AND AN OPPORTUNITY FOR COMMENT.

With narrowly-drawn exceptions, agency rules are subject to the APA's requirement of notice-and-comment rulemaking. 5 U.S.C. § 553; *see Asiana Airlines v. FAA*, 134 F.3d 393, 396 (D.C. Cir. 1998) ("We have looked askance at agencies' attempts to avoid the standard notice and comment procedures, holding that exceptions under § 553 must be 'narrowly construed and only reluctantly countenanced'") (quoting *New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980)). Before issuing a final rule, the agency must first give the public notice by publishing the proposed rule in the Federal Register. 5 U.S.C. § 553(b). Upon publication, the agency must "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments." *Id.* § 553(c).

As explained more fully below, the 2007 Guidance is a rule, *see id.* § 551(4), and was issued without notice or opportunity for public comment, as the Parties agree. *See* Compl. ¶ 40, JA 15; FHWA Mot. Summ. J. 15, 18 (D.E. No. 26-1). None of the § 553 exceptions to notice-and-comment applies to the 2007 Guidance. Even if, as FHWA and Intervenor now claim, the Guidance is an interpretive rule, it significantly revises the FHWA's

13

prior definitive interpretation from its 1990 guidance and thus requires

notice-and-comment. Because FHWA issued the 2007 Guidance without

notice-and-comment rulemaking, the Guidance is invalid.

### A. The 2007 Guidance is not an Interpretive Rule but is Instead a Legislative Rule.

FHWA promulgated a legislative rule when it issued the 2007

Guidance, which exempts digital billboards from the longstanding

prohibition on placing flashing, intermittent, or moving lights on federal

highway billboards.[3]

First, the Court should not be guided by FHWA's characterization of

its 2007 Guidance as an interpretive rule because that interpretation is

irrelevant as to whether the rule is legislative or interpretive. *See Gen.*

*Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984)

(holding that agency's characterization of its rule as interpretive is not

dispositive); *see also* Ronald Pierce, Jr., *Distinguishing Legislative Rules*

---

[3] This Court uses the term "legislative rule" in various ways. "Legislative rule" refers to rules that do not fall into any § 553 exception, *see Elec. Privacy Info. Ctr. v. DHS*, 653 F.3d 1, 11 (D.C. Cir. 2011), as well as rules that do not fall into the APA's particular exception for "interpretive" rules, *see id.* at 6. Courts also use "legislative rule" as "shorthand to denote documents that *are not* in fact legislative rules as just defined–and therefore are *non*legislative rules–but that *should have been* promulgated as legislative rules because the agency treated them as binding." Robert Anthony, *"Interpretive" Rules, "Legislative" Rules and "Spurious" Rules: Lifting the Smog*, 8 Admin. L.J. 1, 3 (1994) (emphasis in original).

14

*from Interpretative Rules*, 52 Admin L. Rev. 547, 555 (2000) (when agency says "it is issuing only an interpretative rule," it "is not appropriate for a court simply to accept the agency's characterization"). FHWA's label has no import because "the agency has an incentive to mischaracterize a legislative rule as interpretative to circumvent the APA rulemaking procedure." Pierce, *Distinguishing Legislative Rules from Interpretive Rules*, at 555; *see Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020 (D.C. Cir. 2000) (describing familiar "phenomenon" where agency creates law "quickly and inexpensively without following any statutorily prescribed procedures," and concluding, "[t]he agency may also think there is another advantage – immunizing its lawmaking from judicial review") (quotation omitted).

    In evaluating whether the 2007 Guidance is interpretive or legislative, the district court solely focused on the four factors set out in *American Mining Congress v. Mine Safety and Health Administration*, any one of which—if answered in the affirmative—would reveal the rule's legislative character. *See* Mem. Op., JA 90 (describing the factors as "(1) If in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) If the agency has published the rule in the Code of Federal Regulations, (3) If the agency has explicitly invoked its general

legislative authority, and (4) If the rule effectively amends a prior

substantive rule.") (citing *Am. Mining Cong.*, 995, F.2d 1106, 1112 (D.C.

Cir. 1993)).

By limiting its analysis to the *American Mining Congress* framework,

however, the district court overlooked and mischaracterized precedent

outside of the four-factor test. If the court had followed Circuit precedent, it

would have found the 2007 Guidance to be a legislative rule because it did

not "interpret" a prior regulation, but instead arbitrarily selected a regulatory

standard, *see Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 495

(D.C. Cir. 2010), and because the Guidance cabins FHWA enforcement

discretion, *see Community Nutrition Institute v. Young*, 818 F.2d 943, 949

(D.C. Cir. 1987). In addition, the district court misapplied the two relevant

factors within the confines of the *American Mining Congress* test—that in

the absence of the Guidance "there would not be an adequate legislative

basis" for agency action, and that the 2007 Guidance "effectively amends a

prior legislative rule."[4]

---

[4] The other two factors from *American Mining Congress* "have been de-emphasized" over the years and are no longer dispositive whether a rule is interpretive or legislative. *See Pharm. Research & Mfrs. of Am. v. HHS*, 2014 U.S. Dist. LEXIS 70894, *50 n.17 (D.D.C. May 23, 2014) (citing *Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 423 (D.C. Cir. 1994)). Agencies with the incentive to bypass the notice-and-comment process to still produce a legislative rule can avoid triggering the other two factors by

**1. The 2007 Guidance is a legislative rule because it establishes arbitrary numerical regulatory standards that are not derived from "interpreting" the statute or previous regulations.**

The district court's finding that the 2007 Guidance is an interpretive rule is erroneous because it based that determination on the faulty assumption that this Court "has been amenable to interpretive rules that derive highly specific, numerical interpretations from seemingly vague source material." Mem. Op., JA 97. To the contrary, recent Circuit precedent holds that an agency's selection of arbitrary numeric criteria in a regulation constitutes a legislative rule. *See Catholic Health Initiatives*, 617 F.3d at 495. In its 2007 Guidance, FHWA created a legislative rule by exempting from its lighting regulations digital billboards that display advertisements for a duration of four- to ten- seconds and digital billboards taking no longer than four seconds of transition time between advertisements.

Furthermore, an agency creates a legislative rule by creating standards "in numerical terms that cannot be derived from a particular record." *See id.* (quoting Henry J. Friendly, *Watchman, What of the Night?*, *in* Benchmarks 144-45 (1967)). Adopting reasoning from the Seventh Circuit case *Hoctor v. U.S. Department of Agriculture*, this Court has held that an agency performs

---

giving notice on the agency website–rather than the Code of Federal Regulations–and taking care not to invoke the agency's general legislative authority. *See Appalachian Power Co.*, 208 F.3d at 1020.

17

a legislative function when it "base[s] rules on arbitrary choices" that are not derived from a statute or regulation, and "[a] rule that turns on a number is likely to be arbitrary in this sense." *Catholic Health Initiatives*, 617 F.3d at 495 (quoting *Hoctor*, 82 F.3d 165, 170-71 (7th Cir. 1996) (Posner, C.J.)).

FHWA's arbitrary selection of advertisement timing standards to apply to FSAs prohibiting "flashing, intermittent, or moving" lights is analogous to the U.S. Department of Agriculture's ("USDA") assignment of quantitative criteria to a regulation in *Hoctor*, which the Seventh Circuit held to be a legislative rule. *See Hoctor*, 82 F.3d 165, 169-70. At issue in *Hoctor* was a USDA memorandum, addressed to USDA inspectors, which interpreted a regulation that required exotic animals to be housed in containments of appropriate "structural strength." *Id.* at 167-68. The memorandum required a fence to be at least eight feet tall in order to comply with the structural strength regulation. *Id.* USDA issued the memorandum without notice-and-comment and without any explanation as to why the government selected the particular fencing height. *Id.*

Writing for the panel, Judge Posner first noted that nothing in the enabling statute spoke of fencing heights, and thus USDA's creation of numeric standards was a "legislative task." *Id.* at 169; *see also Mendoza v. Perez*, 754 F.3d 1002, 1022 (D.C. Cir. 2014) ("Where Congress has

18

specifically declined to create a standard, the [agency] cannot claim its implementing rule is an interpretation of the statute"). Like the statute in *Hoctor*, here the HBA provides no standard that FHWA can claim to interpret in the 2007 Guidance but instead generally "authorizes an agency to create standards." *Hoctor*, 82 F.3d at 169; *see* 23 U.S.C. § 131(d) ("[S]igns, displays, and devices whose size, lighting and spacing, consistent with customary use is to be determined by agreement between the several States and the Secretary.").

Second, Judge Posner held that USDA was not interpreting its own animal housing regulations because it is "obvious that eight feet is not part of the meaning of secure containment." *Id.* at 170. There was no "cloistered, appellate-court type reasoning" by which the agency "could have excogitated" the rule from the regulation. *Id*. at 171; *see also Cent. Tex. Tel. Coop., Inc. v. FCC*, 402 F.3d 205, 212 (D.C. Cir. 2005) ("[An interpretive rule] must derive a proposition from an existing document whose meaning compels or logically justifies the proposition") (citation omitted). Because USDA selected an arbitrary numerical value out of several possible alternatives, the agency made a value judgment, which must be left to a democratically elected legislature or an agency held accountable to the public via § 553 procedures. *See Hoctor*, 82 F.3d at 171 ("The notice of

proposed rulemaking corresponds to the bill and the reception of written comments to the hearing on the bill.").[5]

Similarly, in *Catholic Health Initiatives*, the this Court found that U.S. Department of Health and Human Services' numeric cut-off limiting reimbursements to hospitals for malpractice was not an interpretation of its previous broadly worded regulation, which allowed the reimbursement of "reasonable costs" incurred by healthcare providers in the treatment of Medicare beneficiaries. 617 F.3d at 491; *see id.* at 496 (finding agency to be legislating, and not interpreting, the regulation, because "it is impossible to give a reasoned distinction between numbers just a hair on the OK side of the line and ones just a hair on the not-OK side.") (quoting *Mo. Pub. Serv. Comm'n v. FERC*, 215 F.3d 1, 4 (D.C. Cir. 2000)).

The 2007 Guidance is thus legislative because FHWA selected quantitative time criteria for both the duration and transition of lighted advertisements without any "cloistered appellate-court type reasoning," indicating that the agency had engaged in a process of interpretation. Varying decisions from FHWA regional division offices reviewing FSA prohibitions on intermittent, flashing, or moving lights prior to the 2007

---

[5] An archetypal example is a statute of limitations, an inherently arbitrary decision best left to the legislature. *Hoctor*, 82 F.3d at 170.

20

Guidance highlight the arbitrariness of the Guidance's time intervals. Before FHWA imposed these numeric standards, the Indiana Division office allowed digital messages that displayed for eight seconds and transitioned between messages in no less than two seconds; the New York Division required any digital messages to remain static for at least twenty-four hours before transitioning; and the Texas Division prohibited digital messages altogether. *See* Mem. Op., JA 84. In its four-page Guidance, the agency "has not even made the attempt" to explain–let alone provide interpretive reasoning–why it ultimately selected a four- to ten- second duration as allowed under the FSAs, as opposed to the standards developed by the Indiana, New York, or Texas Divisions. *See Catholic Health Initiatives*, 617 F.3d at 496.[6]

The 2007 Guidance thus provides arbitrary numeric standards in a four-page conclusory document without record support, and it is thus the product of legislative rulemaking.

---

[6] In fact, FHWA appears to have arrived at its timing criteria by simply surveying its state offices and selecting advertisement duration and transition ranges that most align with the outdoor advertisement industry's expressed preferences. *See* Aug. 1., 2007 Email from FHWA's Gerald Solomon, JA 465.

## 2.  The 2007 Guidance is a legislative rule because it restricts agency enforcement discretion.

The 2007 FHWA Guidance cabins the discretion previously held by agency officials to determine if a billboards violates FSA common lighting prohibitions on intermittent, flashing, or moving lights. The district court erred in determining that the restriction of agency officials' discretion is irrelevant to whether an agency action is a legislative rule. Mem. Op., JA 95-96. However, the district court erred because agency restriction of its officials' enforcement discretion can rise to the level of a substantive legislative rule. *See Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980); *Spirit of Sage Council v. Norton*, 294 F. Supp. 2d 67, 86-88 (D.D.C. 2003).

As occurred in this case, when an "agency has chosen to limit its discretion" by directing agency enforcement action to adhere to specific numerical guidelines, the agency has promulgated a legislative rule. *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987). In *Community Nutrition*, FDA promulgated a rule establishing that any corn producer that sells products with contaminants identified as aflatoxins in excess of 20 parts per billion are subject to enforcement action. *Id*. at 945. This "action level" bound the agency because "it would be daunting indeed to try to convince a court that the agency could appropriately prosecute a producer for shipping

corn with less than 20 ppb aflatoxin." *Id.* at 947-48. The court concluded that a regulation that commits the agency to a particular course of action "can in fact rise to the level of a substantive, legislative rule." *Id.*

The *Community Nutrition* holding—that cabining agency enforcement discretion through the imposition of arbitrary standards constitutes legislative rulemaking—has been applied repeatedly in this jurisdiction. *See, e.g., Nat'l Family Planning and Reprod. Health Ass'n. v. Sullivan*, 979 F.2d 227, 238-39 (D.C. Cir. 1992) (finding that, "rather than simply interpreting the rule," agency promulgated legislative rule in limiting its officials' discretion to grant funding to physicians who refused to consult with patients about abortions); *Spirit of Sage Council*, 294 F. Supp. 2d at 86-88 (finding legislative rule when Fish and Wildlife Service restricted its discretion to revoke Incidental Take Permits, over agency's claim that it "merely conformed FWS regulations to the statute"); *Alaska v. U.S. DOT*, 868 F.2d 441, 446-47 (D.C. Cir. 1989) (finding Department of Transportation interpretation constituted a legislative rule because of "the use of mandatory language cabining DOT's enforcement discretion").

Here, FHWA has issued a rule akin to the action level in *Community Nutrition* because "it would be daunting indeed" for the agency to claim it could enforce against states that approve digital billboards that fit within the

23

"acceptable criteria" of the 2007 Guidance. *See Cmty. Nutrition Inst.*, 818 F.2d at 948; 2007 Guidance, JA 537. The district court thus correctly found that the 2007 Guidance removed agency "discretion to categorically reject States' digital-billboard proposals." Mem. Op., JA 96.

But the district court then erred in parroting the *American Mining Congress* statement that "restricting agency discretion…tells one little about whether a rule is interpretive." Mem. Op., JA 96. The court in *American Mining Congress* arrived at this conclusion by claiming to follow *Community Nutrition*, describing the inquiry into agency discretion as only useful for "distinguishing *policy statements*, rather than interpretive rules, from legislative norms." *Am. Mining Cong.*, 995 F.2d at 1111 (emphasis in original). Except the *Community Nutrition* court, in fact, held that when agency statements "are non-binding in nature," the statements "would thus be characterized by a court as interpretative rules or policy statements." *See Cmty. Nutrition Inst.*, 818 F.2d at 949. One of the *Community Nutrition* panelists in another case even described *Community Nutrition* as discerning whether FDA's action level "constituted a legislative or interpretative rule." *Alaska*, 868 F.2d at 445 (Starr, J.). FHWA's restriction of its enforcement discretion, thus, created a legislative rule, regardless of the agency's

24

characterization of the 2007 Guidance as an interpretive rule or a policy

statement.[7]

### 3. The 2007 Guidance is a legislative rule because it serves as the "legislative basis" for agency action.

By redefining its FSAs with an "interpretation [that] runs 180 degrees

counter to the plain meaning of the regulation," FHWA created a legislative

rule. *See Nat'l Family Planning*, 979 F.2d at 235; *Steinhorst Assocs. v.*

*Preston*, 572 F. Supp. 2d 112, 121 (D.D.C. 2008) (rule "cannot be

interpretative if the regulatory framework it purports to interpret would yield

the opposite result"). As the district court explained, "an agency that

misreads a statute to give it authority that it does not actually possess would,

technically, lack the legislative basis to act in the absence of that incorrect

interpretation." Mem. Op., JA 93 (referring to the first *American Mining*

*Congress* factor). This is exactly what happened here:  FHWA's exemption

---

[7] Indeed, FHWA and Intervenor framed the 2007 Guidance as a policy statement–as opposed to an interpretive rule–both before Plaintiff filed suit and then throughout this litigation until the Motion for Summary Judgment. *See* Email from FHWA Associate Administrator Gloria Shepherd, JA 527 (describing 2007 Guidance as "updated guidance" that would "advise" agency officials and public of "current status of our policy"); Intervenor's Mot. Dismiss (D.E. No. 9 at 19-21) (arguing that 2007 Guidance is an "internal policy statement"). FHWA's mid-litigation shift to a *post-hoc* characterization of the rule as interpretive is "of no avail" because the label an agency places upon its action is not conclusive; "rather it is what the agency does in fact." *Nat'l Family Planning*, 979 F.2d at 237-38 (quoting *Lewis-Mota v. Sec'y of Labor*, 469 F.2d 478, 481-82 (2d Cir. 1972)).

of digital billboards that rapidly change lighted messages runs counter to the plain meaning of the FSA proscriptions of "flashing" and "intermittent" lights.[8] Therefore, the 2007 Guidance is a legislative rule.

In *National Family Planning*, the Department of Health and Human Services issued a directive explaining that physicians receiving funding under Title X of the Public Health Services Act were permitted to consult with patients about abortion. *Nat'l Family Planning*, 979 F.2d at 235. The directive, issued without notice-and-comment, departed from an existing regulation that prohibited healthcare providers from consulting about abortion. This switch in the agency's interpretation of the statute constituted legislative rulemaking, for the second agency rule ran "180 degrees counter" to the plain meaning of the first rule "by cutting back significantly on its scope and proscriptions." *Id*. The agency created a "direct clash" with the second regulation, effectively amending the first regulation. *Id* at 236.

---

[8] The district court erroneously gave heightened "deference" to FHWA's new interpretation of a previous regulation when deciding if that interpretation runs counter to the plain meaning of the regulation. *See* Mem. Op., JA 93 (holding that the standard of review "is even more deferential than the one associated with *Chevron*"). The cut-and-dry inquiry into whether an agency rule runs counter to an existing regulation leaves no room for deference. *See Nat'l Family Planning*, 979 F.2d at 235-36; *see also Berlex Labs, Inc. v. FDA*, 942 F.Supp. 19, 26-27 (D.D.C. 1996) (affirming that an agency "reversal of course" from a previous regulation constitutes a legislative rule). The question is simply if the second rule runs counter to the first legislative one, determined *de novo* by a reviewing court.

26

Like the directive in *National Family Planning*, the 2007 Guidance runs counter to the plain meaning of both the overall FSA lighting regulations the Guidance claims to interpret and also the specific terms contained therein, significantly cutting back FSA proscriptions. FHWA's determination that digital billboards that meet the criteria set forth in the 2007 Guidance *per se* do not contain flashing, intermittent, or moving lights is contrary to the everyday meaning of those terms.

"Flashing" means a "sudden, brief light." *Webster's New World College Dictionary* 538-39 (4th ed. 2009). A lighted image that changes within one second, *see* FHWA Guidance Memorandum on Off-Premise Changeable Message Signs, JA 537 (allowing message transition for one- to four- seconds), is "flashing," or a "sudden" shift in light. *See also* Decl. of Nikki Laliberte ¶ 4, JA 52 ("The digital billboard generates a bright flash when its display transitions from one advertisement to another").

"Intermittent" is defined as "stopping and starting at intervals; pausing from time to time; periodic." *Webster's* at 745. The 2007 Guidance allows for LEDs in lighted messages that stop and start at intervals of four to ten seconds, thus "intermittent" LEDs. *See* FHWA Guidance Memorandum, JA 537; *cf. Bush v. Thoratec Corp.*, 13 F. Supp. 3d 554, 576 (E.D. La. 2014) (describing an "intermittent" alarm as one that beeps "every second or every

27

four seconds") (internal quotation omitted). While drafting the 2007 Guidance, even FHWA officials believed that the message intervals created "intermittent" light. *See*, *e.g.*, O'Hara Email, JA 518 ("[A]ny illuminations which go on or off more than once a day are intermittent lights."); Black Email, JA 533 (describing his "tough time with coming up with a clear way to define the term 'intermittent'" consistent with the law).

The district court erred in determining that because digital billboard "LEDs are required to remain steady for several seconds at a time," the 2007 Guidance comports with the FSA prohibition on intermittent lights. Mem. Op., JA 94. To the court, lighted messages that are static for four seconds at a time do not constitute intermittent light, because they are not "starting, stopping, and starting again" and are thus constant. *Id*. (quoting *Merriam-Webster*, www.merriam-webster.com). Yet the court completely ignored the 2007 Guidance's provision that allows for a one- to four- second "transition time" between messages. *See* JA 537. Thus, the 2007 Guidance allows for a billboard that displays a lighted message for four seconds, turns blank for two seconds, and then displays a newly lighted message. *See Scenic Ariz. v. Phoenix Bd. of Adjustment*, 268 P.3d 370, 378 (Ariz. Ct. App. 2011) ("What [OAAA] calls a change of 'copy' is actually a transition from one lighted image to the next lighted image."). The district court's own definition of

28

"intermittent" allows a billboard to display lights that "start, stop, and start again" in even less than four seconds.

Moreover, by finding that LED lights "required to remain steady for several seconds" are not "intermittent," the district court read "intermittent" out of the FSA common lighting standards. LEDs that turn on and off at a more rapid rate than allowed in the 2007 Guidance are sudden, brief light and thus "flashing," and light that does not remain steady is "moving." Thus, under FHWA and the district court's construction of the FSAs, "intermittent" has no independent meaning. *See Petit v. U.S. Dep't of Ed.*, 675 F.3d 769, 793 (D.C. Cir. 2012) ("As we have often explained, judges should hesitate to treat words in a statute or regulation as mere surplusage—words of no consequence.").

Because the 2007 Guidance is a rule that interprets FSA common lighting terms in a way that runs 180 degrees counter to the plain meaning of the prohibitions on "flashing" and "intermittent," it constitutes a legislative rule. *See Nat'l Family Planning*, 979 F.2d at 235.

### 4. The 2007 Guidance is a legislative rule because it "effectively amends a prior legislative rule" by granting new rights to private entities.

The FHWA 2007 Guidance restricts agency authority to prohibit certain digital billboards, thereby "amending a prior legislative rule" by

granting substantive rights to digital billboard operators who are now immune from agency regulation. *See Am. Mining Cong.*, 995 F.2d at 1112. The agency grant of new rights to private entities is a legislative rule that requires notice and comment. *See Batterton*, 648 F.2d 694 at 701-02 (agency rules are legislative when they "grant rights, impose obligations, or produce other significant effects on private interests."); *see also Cabais v. Egger*, 690 F.2d 234, 237 (D.C. Cir. 1982) (finding the grant of new rights "one of several criteria for evaluating claims of exemption" from APA notice-and-comment requirements) (citations omitted).

The FHWA 2007 Guidance grants new rights to digital billboard operators by giving them unlimited authorization to emit changing commercial advertisement messages that meet specific lighting criteria, which previously were prohibited. For example, prior to the 2007 Guidance, an advertiser in Texas could not even erect a digital billboard along a federal highway, pursuant to the FSA lighting prohibitions. JA 263-64. Following the 2007 Guidance, however, billboard operators in Texas may now display digital lighted commercial messages that meet Guidance criteria. New York billboard operators, too, now have the right to display digital messages as often as every four seconds; prior to the Guidance, they were not permitted to display digital messages within twenty-four hours of each other. JA 420.

As New York and Texas show, the 2007 Guidance's "significant effects on private interests," makes it a legislative rule. 2007 Guidance, JA 536 (explaining that "advances in technology and affordability" require the agency to "expand on" the 1996 memorandum); *see Nat'l Family Planning*; 979 F.2d at 239 (legislative rule when doctors were granted authority to offer abortion consultation for the first time); *Spirit of Sage Council*, 294 F.Supp.2d at 87 (legislative rule when the agency limited its authority to revoke Incidental Take Permits, granting permit extensions—and thus new rights—to those that take endangered species); *cf. Associated Builders & Contractors, Inc. v. Reich*, 922 F. Supp. 676, 681 (D.D.C. 1996) (allowing registration in apprenticeship program with fewer requirements).

## B. Even If The 2007 Guidance Is Interpretive, It Still Required Notice-And-Comment Because It Amended A Definitive Agency Interpretation.

Even if, as FHWA and Intervenor argue, the 2007 Guidance is an interpretive rule, FHWA still violated the APA when it bypassed notice-and-comment rulemaking because the Guidance "significantly revises" a prior "definitive interpretation." *See Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999). When "an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment

31

rulemaking." *Paralyzed Veterans of Am. v. D.C. Arena*, 117 F.3d 579, 586 (D.C. Cir. 1997).

In *Alaska Hunters*, the Federal Aviation Administration changed its interpretation of regulations concerning commercial air operators. 177 F.3d at 1032. Previously, the agency exempted from its regulations guides who piloted hunting expeditions; the agency's new interpretation required guides to comply. The court determined that the exemption removal impermissibly avoided notice-and-comment because it amended an interpretive rule of a substantive regulation. *Id.* at 1034; *see also Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94-95 (D.C. Cir. 1997) (interpretations that modify an agency's own authority are substantive rules).

Notice-and-comment was similarly necessary when FHWA issued the 2007 Guidance because it significantly revised the agency's interpretation of the FSA lighting prohibitions—definitively set forth in its 1990 guidance memorandum. In the 1990 guidance, the agency declared that under the FSA lighting regulations, electronic variable messages could not be displayed on billboards "irrespective of the method used to display the changing message," including "evolving technology such as lights." JA 163. In its 2007 Guidance, FHWA authorized lighted electronic variable messages for

the first time, effectively overruling and amending its 1990 interpretation of its lighting regulations.

The district court mistakenly determined that FHWA's 1996 guidance "reversed the 1990 memorandum by guardedly approving [variable lighting] technology." *See* Mem. Op. JA 105-06. In fact, the agency's 1996 interpretation of the FSA lighting regulations only permitted unlighted "panels or slats that rotate," and reiterated that billboards "may still not contain flashing, intermittent, or moving lights." JA 182 (reinforcing the agency's 1990 FSA lighting prohibitions). Thus, the 2007 Guidance "significantly revised" the agency's definitive interpretation established in its 1990 guidance, requiring notice-and-comment.

As the district court observed, the *Alaska Hunters* doctrine is under review by the Supreme Court. Mem. Op., JA 103 (discussing *Mortg. Bankers Ass'n v. Harris*, 720 F.3d 966 (D.C. Cir. 2013), *cert. granted sub nom.*, *Perez v. Mort. Bankers Ass'n*, 134 S.Ct. 2820 (2014)). During that recent oral argument, several Justices expressed concern with the general agency overuse of interpretive rules. *See*, *e.g.*, Transcript of Oral Argument at 14, Perez v. Mort. Bankers Ass'n (U.S. Dec. 1, 2014) (No. 13-1041) ("[A]gencies more and more are using interpretive rules and are using guidance documents to make law and that there is…an end run around the

[APA] notice and comment provisions.") (Kagan, J.). Should the Supreme Court strike down the doctrine, this Circuit will lose a vital means of monitoring agency attempts to avoid notice-and-comment by labeling rules interpretive and the backstop the doctrine plays against unchecked agency action. Accordingly, Scenic America respectively suggests that this Circuit should take the opportunity presented by this case to reemphasize the narrow character of the "interpretive rule" exception under the APA. FHWA's employment of the exception to reverse course from its prior understanding of the FSA common lighting standards highlights the value of a reviewing court in deterring agencies from issuing vague regulations and subsequently "interpreting" the regulations in a way that "[l]aw is made, without notice and comment." *Appalachian Power Co.*, 208 F.3d at 1020.

## II.    FHWA VIOLATED THE HIGHWAY BEAUTIFICATION ACT BY CREATING LIGHTING STANDARDS THAT ARE NOT "CONSISTENT WITH CUSTOMARY USE."

In its analysis of Plaintiff's claim that the 2007 Guidance violated the HBA's requirement that "size, lighting, and spacing" standards for billboards on highways be "consistent with customary use," the district court held that because the Guidance "merely interprets" the FSAs, the Guidance cannot violate the statute. Mem. Op., JA 108 ("Since the Court has previously found that the 2007 Guidance merely interprets those provisions

34

[of the FSAs], it is inescapable that the document is similarly consistent with customary use."). This holding was erroneous because the 2007 Guidance's interpretation of the FSA lighting standard terms changes the FSAs to such an extent that they are not "consistent with customary use," violating the HBA.

An interpretation of a regulation may so alter the regulation's meaning that it is no longer "in accordance with" the statute, which is precisely what has occurred in the 2007 Guidance. *See* 5 U.S.C. § 706(2)(A); *see Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 79 (2d Cir. 2006) (collecting cases supporting the principle that an "interpretation of ambiguous regulation is subject to the same substantive review as any other exercise of delegated lawmaking power"); *see also Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 377 (1998) ("Substantive review of an agency's interpretation of its regulations is governed only by [§ 706(2)(A)]."). Moreover, the district court's determination that FHWA's "mere interpretation" of the FSAs could not violate section 706(2) contradicts an earlier passage in its own opinion, where the district court held that a rule may be interpretive "even if . . . it widens that duty even beyond the scope allowed to the agency under Chevron." Mem. Op., JA 93 (quoting *Am. Mining Cong.*, 995 F.2d at 1110).

Because FHWA's interpretation converts the FSAs into standards that are not "consistent with customary use," the 2007 Guidance is not in accordance with the HBA. 23 U.S.C. § 131; *see* 5 U.S.C. § 706(2)(A).

### A. FHWA's 2007 Understanding of FSA Terms Misreads the HBA's "Customary Use" Requirement.

The HBA allows no "signs, displays, [or] devices" on federal roads, except those "whose size, lighting and spacing, consistent with customary use is to be determined by agreement between the several States and the Secretary." 23 U.S.C. § 131(d). "Customary use" refers to the permissions and prohibitions contained in FSAs as set forth therein, meaning that an FSA prohibition on "flashing, intermittent or moving lights" is a feature of the "customary use" of billboard lighting for that FSA's jurisdiction. *See* Mem. Op., JA 108. Anything outside the scope of what an FSA meant at the time it was created cannot be "customary use."

The 2007 Guidance defines "intermittent," "flashing," and "moving" in a way that unilaterally amends all FSAs that contain the common lighting standards, making them inconsistent with the HBA "customary use" provision. That is, FHWA's new definitions contravene HBA purpose, *see* 28 U.S.C. § 131(a), and cut against the legislative history and plain meaning of "customary use."

36

### 1. The 2007 Guidance conflicts with the HBA's purpose.

The HBA was enacted to preserve natural beauty and promote highway safety. 23 U.S.C. § 131(a) (congressional findings); Brief for United States as Amici Curiae Supporting Petitioners at 1, Reed v. Town of Gilbert, Ariz., (U.S. 2014) (No. 13-502) (explaining HBA "encourages States to limit signs along certain major highways in the interest of *promoting highway safety* and *preserving natural beauty*") (emphasis added).

The legislative history of the HBA's "customary use" provision reinforces the law's twin purposes. The requirement that the federal government and the States negotiate highway sign standards "consistent with customary use" was attributed to a 1965 letter from Commerce Secretary Connor,[9] which assured Congress that the federal government would regulate billboards with "standards of size . . . consistent with standard size billboards in customary use." 111 Cong. Rec. 26, 295, *reprinted in* 1965 U.S. Code Cong. Ad. News, p. 3713-14. Secretary Connor wrote that "billboard advertising," left uncontrolled, "results in a public eyesore,"

---

[9] The Department of Transportation Act of 1966 led to the transfer of the Bureau of Public Roads from the Commerce Department to the Department of Transportation, creating the new FHWA. David Kunz, *Section 4(f): Analyzing Differing Interpretations and Examining Proposals for Reform*, 31 J. Legis. 275, 279 n.24 (2005).

37

harming natural beauty. *Id.*; *see id.* (finding it "obvious that lighting arrangements which clearly pose a highway safety problem should be curtailed.").[10]

Congress also included the "customary use" provision to specify *who* should determine size, space, and lighting standards. As Intervenor has noted, Congress added "customary use" to assuage fears about federal agency overreach in determining billboard restrictions. *See* Intervenor Mot. Summ. J. 27 (D.E. 25 at 27) (quoting Rep. Wright as explaining the amendment "might give some relief to the great concern . . . expressed here today that the Secretary of Commerce is getting broad, unrestrained, discretionary authority to determine size, spacing and lighting in an entirely new area of law," *see* 111 Cong. Rec. 26,296 (1965)).

Representative Tuten's amendment to include "customary use" in the HBA satisfied both Secretary Connor's letter and Representative Wright's statement. The amendment mandated that standards "consistent with customary use" be established "by agreement between the several States and the Secretary," thus requiring the federal government "to negotiate an

---

[10] "Lighting arrangement" safety concerns have persisted in the federal government, and were repeated just weeks before FHWA issued the 2007 Guidance. *See* August 1, 2007 Email from FHWA's James Cheatham, JA 464 ("It has come to DAC's attention that the uses of Digital Bill Boards or CEVMS are becoming prevalent in some states and there are traffic safety concerns.").

agreement with each state based on what was customary at the time." Susan Sharpe, *Between Beauty and Beer Signs: Why Digital Billboards Violate the Letter and Spirit of the Highway Beautification Act of 1965*, 64 Rutgers L. Rev. 515, 527 (2012) (citing Charles Floyd, *Billboard Control under the Highway Beautification Act—A Failure of Land Use Controls*, 45 J. Am. Plan. Ass'n 115, 116 (1979)). From 1967 to 1973, most states implemented the "customary use" provision by negotiating FSAs with the federal government. *See, e.g.,* New York FSA, JA 112 (May 1968 agreement "to determine the size, lighting, and spacing of signs, displays, and devices, consistent with customary use").

Thus, "customary use" refers to restrictions that existed in the jurisdiction in which the federal government and States finalized each negotiated FSA. FHWA's own 1980 Guidance confirms this reading, explaining that the FSAs "reflect a negotiated position reflecting customary use in each State while preserving the intent and purpose of Federal law." 1980 Memorandum on Outdoor Advertising Program (D.E. 28-1 at 17). If "customary use" allowed whatever technological vehicle the industry subsequently discovers to be the most profitable, as FHWA and Intervenor have argued, *see*, *e.g.*, FHWA Mot. Summ. J. (D.E. 26-1 at 34), the statutory term would have no meaning whatsoever. *Cf. Tijerina v. Walters*, 821 F.2d

39

789, 797 (D.C. Cir. 1987) (rejecting broad reading of Privacy Act exemption

because government's interpretation "would give agencies license to defang

completely the strict limitations on disclosure that Congress intended to

impose").

### 2. The 2007 Guidance departs from the plain meaning of "customary use."

The 2007 Guidance characterizes FSA lighting standards in a way that

contravenes their prohibitions of "flashing" and "intermittent" lights,

creating revised standards that are inconsistent with "customary use." As

described in Argument Section I.A.3, the Guidance allows for billboards that

turn on and off LED lights at intervals as rapid as one- to four- seconds,

which provides a quintessential example of "intermittent" or "flashing"

lights.

In addition, FHWA's new "acceptable criteria" allows signs with

changing illuminations of date and temperature, rendering many FSA

exemptions for billboards "giving public service information" as surplusage

and indicating that the new lighting criteria are broader than–and thus not

consistent with–the negotiated "customary use." *See*, *e.g.*, New York FSA,

JA 120 (exempting signs which include illumination of "time, date,

temperature, weather, or similar information"). If the prohibition on

"intermittent" lights allows changes in lighting every few seconds, as the

40

2007 Guidance defines the term, then FSA exceptions for lighted signs showing time, date, and temperature have no meaning.

By deviating from the FSA "customary use" lighting standards, the Guidance allows billboards to emit bright, rapidly changing lights to display commercial messages along federal highways, degrading natural beauty and creating safety issues. *See* 23 U.S.C. § 131(a). FHWA's 2007 Guidance immunizes from statutory violation billboards "whose size, lighting, and spacing" are not consistent with the "customary use" standards originally determined in the vast majority of FSAs, violating the HBA. *Id.* § 131(d); 5 U.S.C. § 706(2)(A).

## B. FHWA's Faulty Construction of the "Customary Use" Requirement Deserves No Deference.

Before the district court, FHWA claimed that its new construction of "customary use" lighting standards in the 2007 Guidance deserves deference. *See*, *e.g.*, FHWA Mot. Summ. J. (D.E. 26-1 at 31). In particular, FHWA relied on *Auer v. Robbins*, 519 U.S. 452 (1997), to argue that the Guidance "was a reasonable interpretation of existing FSA terms, not the creation of a new lighting standard beyond the FSA or in contravention of it" and, therefore, "entitled to deference." FHWA Reply Mot. Summ. J. (D.E. 35 at 20). FHWA's 2007 Guidance, however, has none of the hallmarks of an agency interpretation worthy of judicial deference.

### 1. FHWA is not entitled to *Auer* deference.

Until recently, courts have unquestioningly followed the "deferential standard" that an agency's interpretation of its own regulations is "controlling unless 'plainly erroneous or inconsistent with the regulation.'" *Auer*, 519 U.S. at 461 (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). "In practice, *Auer* deference is *Chevron* deference applied to regulations rather than statutes." *Nw. Envtl. Def. Ctr. v. Decker*, 133 S. Ct. 1326, 1339 (2013) (Scalia, J., dissenting).

Recent pronouncements by the Supreme Court, however, place *Auer* deference in doubt. *See id.*, 133 S. Ct. at 1339 (Roberts, C.J., concurring) ("The bar is now aware that there is some interest in reconsidering [*Seminole Rock* and *Auer*], and has available to it a concise statement of the arguments on one side of the issue."). FHWA's Guidance is a particularly inappropriate object for deference because Congress added the "customary use" provision to prevent executive branch overreach, and because the FHWA has characterized the FSAs as ambiguous in order to protect its shifting interpretations. These facts map onto two central concerns with *Auer* deference: it is "contrary to the fundamental principles of separation of powers to permit the person who promulgates law to interpret it," and it "encourages the agency to enact vague rules which give it the power, in

42

future adjudications, to do what it pleases." *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2266 (2011) (Scalia, J., concurring).

First, Justice Scalia's separation of powers concern carries particular weight here, where FHWA is seeking deference for its interpretation of a regulation derived from a statute provision "intended to limit the Secretary's authority." Intervenor Mot. Summ. J. (D.E. 25 at 28); *see* 111 Cong. Rec. 26,296 (1965) (statement of Rep. Wright) (describing congressional concerns of "broad, unrestrained, discretionary authority to determine size, spacing and lighting").

Second, applying *Auer* deference would both reward FHWA for having been "vague in framing regulations, with the plan of issuing interpretations to create the intended new law without observance of notice and comment procedures." *Decker*, 133 S. Ct. at 1341 (Scalia, J., dissenting) (quoting Robert Anthony, *The Supreme Court and the APA: Sometimes They Just Don't Get It*, 10 Admin. L.J. Am. U. 1, 11-12 (1996)). FHWA has without notice-and-comment issued a Guidance that puts forth a broad, vague reading of the FSAs, which are the very vehicle Congress designated as controlling HBA implementation to protect regulated industry and the public from executive fiat. Deferring to FHWA here would nakedly ignore congressional intent while also allowing that agency to develop nearly any

43

"interpretation" it desires. *See* FHWA Mot. Summ. J. (D.E. 26-1 at 34) (claiming the HBA "incorporate[s] new technology as appropriate with refinement of the relevant standards").

But even by *Auer*'s own terms, FHWA should not receive deference for its 2007 Guidance. Deference is "undoubtedly inappropriate" when, as here, "the agency's interpretation is 'plainly erroneous or inconsistent with the regulation.'" *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (quoting *Auer*, 519 U.S. at 461); *see* Argument Section I.3.A (showing how the 2007 Guidance runs counter to the FSAs). In addition, the 2007 Guidance's rejection of the 1990 and 1996 Guidance interpretations that "[i]n nearly all States, these signs may still not contain flashing, intermittent, or moving lights," 1996 Guidance, JA 182, makes deference to the FHWA's new interpretation inappropriate. *See Christopher*, 132 S. Ct. at 2166 ("[D]eference is likewise unwarranted . . . . when the agency's interpretation conflicts with a prior interpretation").

### 2.  FHWA does not deserve *Chevron* deference.

Nor can FHWA claim that its new construction of the FSA lighting terms, issued without notice-and-comment rulemaking, is an interpretation of "customary use" worthy of deference, as it lacks the force of law. *See United States v. Mead Corp.*, 533 U.S. 218, 231-32 (2001) (refusing to defer

44

to an agency's interpretation issued in rulings "far removed from notice-and-comment process").

The structure of the HBA shows that Congress did not delegate authority to FHWA to unilaterally determine state "customary use;" rather, FHWA shares that authority with the states. *See* 23 U.S.C. § 131(d) (standards are "to be determined by agreement between the several States and the Secretary"); *see also id.* ("Whenever a bona fide State, county, or local zoning authority has made a determination of customary use, such determination will be accepted in lieu of controls by agreement"); *compare* 23 C.F.R. § 750.108(a), (c) (prohibiting signs "illuminated by any flashing, intermittent or moving light" in a regulation authorized by the 1958 Bonus Act, which allowed national standards "to be prepared and promulgated by the Secretary of Transportation"). Because FHWA's claimed authority as the delegated agency is "incongruous with the statutory purposes and design," FHWA's interpretation does not have the "force of law" and accordingly cannot receive *Chevron* deference. *See Gonzalez v. Oregon*, 546 U.S. 243, 267-268 (2006) (finding Controlled Substances Act structure shows "congressional unwillingness to cede medical judgments to an executive official who lacks medical expertise").

45

Furthermore, because the 2007 Guidance was not promulgated via FHWA's exercise of its statutory authority, it should not receive *Chevron* deference. *Mead*, 533 U.S. at 233-34 (finding Customs classification rulings, issued without notice-and-comment process, is "beyond the *Chevron* pale"). The agency's new interpretation of lighting standards, "consistent with customary use," was not the product of notice-and-comment rulemaking; instead, the 2007 Guidance offers "little more than uncited, conclusory assertions of law in a short, informal document." *See Fox v. Clinton*, 684 F.3d 67, 78 (D.C. Cir. 2012); *cf. Astrue v. Capato*, 132 S. Ct. 2021, 2034 (2012) (deferring to agency because its "longstanding interpretation is set forth in regulations published after notice-and-comment rulemaking"). Without undertaking notice-and-comment to produce the Guidance, FHWA deserves no deference for its interpretation of "customary use."[11]

---

[11] Should the Court determine that the 2007 Guidance is an interpretive rule, as FHWA and Intervenor argue, the non-legislative rule would "presumptively receive a weaker brand of deference, as determined by the multifactor test set forth in *Skidmore*." Kozel & Pojanowski, *Administrative Change*, 59 UCLA L. Rev. 112, 119 (2011); *see Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 99 (1995) ("Interpretive rules do not require notice and comment, although . . . they also do not have the force and effect of law and are not accorded that weight in the adjudicatory process.").

### 3. The 2007 Guidance lacks the "power to persuade."

FHWA cannot resuscitate deference to the 2007 Guidance with the persuasive power of its reasoning, because the Guidance lacks both "the merit of its writer's thoroughness, logic and expertness" and "fit with prior interpretations." *Mead*, 533 U.S. at 235 (referencing the factors in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

As explained in Argument Section I.A.1, the conclusory four-page Guidance arrives at "acceptable criteria" for digital billboard lighting without any logical reasoning or expert analysis. FHWA simply surveyed its state offices and selected criteria that aligned with the outdoor advertising industry's request. 2007 Guidance, JA 535-38; Solomon Email, JA 465 ("I would like to confirm that the [FHWA survey] is consistent with the information in [OAAA materials], and plan to incorporate that into a draft 'non-significant' guidance memo to supersede the 1996 Memo."). Unsurprisingly, FHWA's own staff struggled to square the plain meaning of "intermittent" with the meaning put forth in the 2007 Guidance. *See* Black Email, JA 533 ("I am having a tough time with coming up with a clear way to define the term 'intermittent'"); O'Hara Email, JA 518 ("To me, any illuminations which go on or off more than once a day are intermittent lights . . . . I am no attorney, but it is clear as day and night to me, just as these

47

signs are clear at day and night to the traveler"). The 2007 Guidance also does not fit with prior FHWA interpretations of HBA standards, all of which prohibited outdoor advertising that changed messaging through illumination. *See* Argument Section I.B.

Because the 2007 Guidance deserves neither *Auer* nor *Chevron* deference, and because it lacks the "power to persuade," its construction of lighting standards that are not "consistent with customary use" violates both the HBA and the APA. 23 U.S.C. § 131; 5 U.S.C. § 706(2)(A).

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should declare the FHWA's 2007 Guidance as arbitrary, capricious and not in accordance with law and reverse the district court's denial of summary judgment for Scenic America and grant of summary judgment to Defendants and Intervenor.

Respectfully submitted December 22, 2014,

 /s/ Daniel H. Lutz
Daniel H. Lutz
Hope M. Babcock

INSTITUTE FOR PUBLIC REPRESENTATION
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
(202) 662-9535
*Attorneys for Plaintiff-Appellant Scenic America*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type and volume limitations of Fed. R.

App. P. 32(a)(7). The brief contains 10,342 words.

Dated: Dec. 22, 2014

 /s/ Daniel H. Lutz
Daniel H. Lutz
INSTITUTE FOR PUBLIC REPRESENTATION
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
(202) 662-9535
daniel.lutz@law.georgetown.edu

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel H. Lutz, hereby certify that on December 22, 2014, I served

copies of Plaintiff-Appellant's Opening Brief and Addendum, as well as the

Joint Appendix, on the following parties by way of electronic mail (ECF):

    Party:      Defendant-Appellees U.S. Department of Transportation
    Counsel:   Jeffrey Sandberg

    Party:      Intervenor-Appellee Outdoor Advertising Association of
               America, Inc.
    Counsel:   Kannon Shanmugam


Dated: Dec. 22, 2014          /s/ Daniel H. Lutz
                          Daniel H. Lutz
                          INSTITUTE FOR PUBLIC REPRESENTATION
                          Georgetown University Law Center
                          600 New Jersey Avenue NW, Suite 312
                          Washington, DC 20001
                          (202) 662-9535
                          daniel.lutz@law.georgetown.edu

## STATUTORY AND REGULATORY ADDENDUM

### United States Code, Chapter 23, Section 131
### Control of Outdoor Advertizing
### (23 U.S.C. § 131)

(a) The Congress hereby finds and declares that the erection and maintenance of outdoor advertising signs, displays, and devices in areas adjacent to the Interstate System and the primary system should be controlled in order to protect the public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty.

(b) Federal-aid highway funds apportioned on or after January 1, 1968, to any State which the Secretary determines has not made provision for effective control of the erection and maintenance along the Interstate System and the primary system of outdoor advertising signs, displays, and devices which are within six hundred and sixty feet of the nearest edge of the right-of-way and visible from the main traveled way of the system, and Federal-aid highway funds apportioned on or after January 1, 1975, or after the expiration of the next regular session of the State legislature, whichever is later, to any State which the Secretary determines has not made provision for effective control of the erection and maintenance along the Interstate System and the primary system of those additional outdoor advertising signs, displays, and devices which are more than six hundred and sixty feet off the nearest edge of the right-of-way, located outside of urban areas, visible from the main traveled way of the system, and erected with the purpose of their message being read from such main traveled way, shall be reduced by amounts equal to 10 per centum of the amounts which would otherwise be apportioned to such State under section 104 of this title, until such time as such State shall provide for such effective control. Any amount which is withheld from apportionment to any State hereunder shall be reapportioned to the other States. Whenever he determines it to be in the public interest, the Secretary may suspend, for such periods as he deems necessary, the application of this subsection to a State.

(c) Effective control means that such signs, displays, or devices after January 1, 1968, if located within six hundred and sixty feet of the right-of-way and, on or after July 1, 1975, or after the expiration of the next regular session of the State legislature, whichever is later, if located beyond six hundred and

sixty feet of the right-of-way, located outside of urban areas, visible from the main traveled way of the system, and erected with the purpose of their message being read from such main traveled way, shall, pursuant to this section, be limited to (1) directional and official signs and notices, which signs and notices shall include, but not be limited to, signs and notices pertaining to natural wonders, scenic and historical attractions, which are required or authorized by law, which shall conform to national standards hereby authorized to be promulgated by the Secretary hereunder, which standards shall contain provisions concerning lighting, size, number, and spacing of signs, and such other requirements as may be appropriate to implement this section, (2) signs, displays, and devices advertising the sale or lease of property upon which they are located, (3) signs, displays, and devices, including those which may be changed at reasonable intervals by electronic process or by remote control, advertising activities conducted on the property on which they are located, (4) signs lawfully in existence on October 22, 1965, determined by the State, subject to the approval of the Secretary, to be landmark signs, including signs on farm structures or natural surfaces, or historic or artistic significance the preservation of which would be consistent with the purposes of this section, and (5) signs, displays, and devices advertising the distribution by nonprofit organizations of free coffee to individuals traveling on the Interstate System or the primary system. For the purposes of this subsection, the term "free coffee" shall include coffee for which a donation may be made, but is not required.

(d) In order to promote the reasonable, orderly and effective display of outdoor advertising while remaining consistent with the purposes of this section, signs, displays, and devices whose size, lighting and spacing, consistent with customary use is to be determined by agreement between the several States and the Secretary, may be erected and maintained within six hundred and sixty feet of the nearest edge of the right-of-way within areas adjacent to the Interstate and primary systems which are zoned industrial or commercial under authority of State law, or in unzoned commercial or industrial areas as may be determined by agreement between the several States and the Secretary. The States shall have full authority under their own zoning laws to zone areas for commercial or industrial purposes, and the actions of the States in this regard will be accepted for the purposes of this Act. Whenever a bona fide State, county, or local zoning authority has made a determination of customary use, such determination will be accepted in lieu of controls by agreement in the zoned commercial and industrial areas within the geographical jurisdiction of such authority. Nothing in this

subsection shall apply to signs, displays, and devices referred to in clauses (2) and (3) of subsection (c) of this section.

(e) Any sign, display, or device lawfully in existence along the Interstate System or the Federal-aid primary system on September 1, 1965, which does not conform to this section shall not be required to be removed until July 1, 1970. Any other sign, display, or device lawfully erected which does not conform to this section shall not be required to be removed until the end of the fifth year after it becomes nonconforming.

(f) The Secretary shall, in consultation with the States, provide within the rights-of-way for areas at appropriate distances from interchanges on the Interstate System, on which signs, displays, and devices giving specific information in the interest of the traveling public may be erected and maintained. The Secretary may also, in consultation with the States, provide within the rights-of-way of the primary system for areas in which signs, displays, and devices giving specific information in the interest of the traveling public may be erected and maintained. Such signs shall conform to national standards to be promulgated by the Secretary.

(g) Just compensation shall be paid upon the removal of any outdoor advertising sign, display, or device lawfully erected under State law and not permitted under subsection (c) of this section, whether or not removed pursuant to or because of this section. The Federal share of such compensation shall be 75 per centum. Such compensation shall be paid for the following:

    (A) The taking from the owner of such sign, display, or device of all right, title, leasehold, and interest in such sign, display, or device; and

    (B) The taking from the owner of the real property on which the sign, display, or device is located, of the right to erect and maintain such signs, displays, and devices thereon.

(h) All public lands or reservations of the United States which are adjacent to any portion of the Interstate System and the primary system shall be controlled in accordance with the provisions of this section and the national standards promulgated by the Secretary.

(i) In order to provide information in the specific interest of the traveling public, the State transportation departments are authorized to maintain maps and to permit information directories and advertising pamphlets to be made available at safety rest areas. Subject to the approval of the Secretary, a State

53

may also establish information centers at safety rest areas and other travel information systems within the rights-of-way for the purpose of informing the public of places of interest within the State and providing such other information as a State may consider desirable. The Federal share of the cost of establishing such an information center or travel information system shall be that which is provided in section 120 for a highway project on that Federal-aid system to be served by such center or system. A State may permit the installation of signs that acknowledge the sponsorship of rest areas within such rest areas or along the main traveled way of the system, provided that such signs shall not affect the safe and efficient utilization of the Interstate System and the primary system. The Secretary shall establish criteria for the installation of such signs on the main traveled way, including criteria pertaining to the placement of rest area sponsorship acknowledgment signs in relation to the placement of advance guide signs for rest areas.

(j) Any State transportation department which has, under this section as in effect on June 30, 1965, entered into an agreement with the Secretary to control the erection and maintenance of outdoor advertising signs, displays, and devices in areas adjacent to the Interstate System shall be entitled to receive the bonus payments as set forth in the agreement, but no such State transportation department shall be entitled to such payments unless the State maintains the control required under such agreement: Provided, That permission by a State to erect and maintain information displays which may be changed at reasonable intervals by electronic process or remote control and which provide public service information or advertise activities conducted on the property on which they are located shall not be considered a breach of such agreement or the control required thereunder. Such payments shall be paid only from appropriations made to carry out this section. The provisions of this subsection shall not be construed to exempt any State from controlling outdoor advertising as otherwise provided in this section.

(k) Subject to compliance with subsection (g) of this section for the payment of just compensation, nothing in this section shall prohibit a State from establishing standards imposing stricter limitations with respect to signs, displays, and devices on the Federal-aid highway systems than those established under this section.

(l) Not less than sixty days before making a final determination to withhold funds from a State under subsection (b) of this section, or to do so under

54

subsection (b) of section 136, or with respect to failing to agree as to the size, lighting, and spacing of signs, displays, and devices or as to unzoned commercial or industrial areas in which signs, displays, and devices may be erected and maintained under subsection (d) of this section, or with respect to failure to approve under subsection (g) of section 136, the Secretary shall give written notice to the State of his proposed determination and a statement of the reasons therefor, and during such period shall give the State an opportunity for a hearing on such determination. Following such hearing the Secretary shall issue a written order setting forth his final determination and shall furnish a copy of such order to the State. Within forty-five days of receipt of such order, the State may appeal such order to any United States district court for such State, and upon the filing of such appeal such order shall be stayed until final judgment has been entered on such appeal. Summons may be served at any place in the United States. The court shall have jurisdiction to affirm the determination of the Secretary or to set it aside, in whole or in part. The judgment of the court shall be subject to review by the United States court of appeals for the circuit in which the State is located and to the Supreme Court of the United States upon certiorari or certification as provided in title 28, United States Code, section 1254. If any part of an apportionment to a State is withheld by the Secretary under subsection (b) of this section or subsection (b) of section 136, the amount so withheld shall not be reapportioned to the other States as long as a suit brought by such State under this subsection is pending. Such amount shall remain available for apportionment in accordance with the final judgment and this subsection. Funds withheld from apportionment and subsequently apportioned or reapportioned under this section shall be available for expenditure for three full fiscal years after the date of such apportionment or reapportionment as the case may be.

(m) There is authorized to be appropriated to carry out the provisions of this section, out of any money in the Treasury not otherwise appropriated, not to exceed $20,000,000 for the fiscal year ending June 30, 1966, not to exceed $20,000,000 for the fiscal year ending June 30, 1967, not to exceed $2,000,000 for the fiscal year ending June 30, 1970, not to exceed $27,000,000 for the fiscal year ending June 30, 1971, not to exceed $20,500,000 for the fiscal year ending June 30, 1972, and not to exceed $50,000,000 for the fiscal year ending June 30, 1973. The provisions of this chapter relating to the obligation, period of availability and expenditure of Federal-aid primary highway funds shall apply to the funds authorized to be appropriated to carry out this section after June 30, 1967. A State may use

any funds apportioned to it under section 104 of this title for removal of any sign, display, or device lawfully erected which does not conform to this section.

(n) No sign, display, or device shall be required to be removed under this section if the Federal share of the just compensation to be paid upon removal of such sign, display, or device is not available to make such payment. Funds apportioned to a State under section 104 of this title shall not be treated for purposes of the preceding sentence as being available to the State for making such a payment except to the extent that the State, in its discretion, expends such funds for such a payment.

(o) The Secretary may approve the request of a State to permit retention in specific areas defined by such State of directional signs, displays, and devices lawfully erected under State law in force at the time of their erection which do not conform to the requirements of subsection (c), where such signs, displays, and devices are in existence on the date of enactment of this subsection and where the State demonstrates that such signs, displays, and devices (1) provide directional information about goods and services in the interest of the traveling public, and (2) are such that removal would work a substantial economic hardship in such defined area.

(p) In the case of any sign, display, or device required to be removed under this section prior to the date of enactment of the Federal-Aid Highway Act of 1974, which sign, display, or device was after its removal lawfully relocated and which as a result of the amendments made to this section by such Act is required to be removed, the United States shall pay 100 per centum of the just compensation for such removal (including all relocation costs).

(q)(1) During the implementation of State laws enacted to comply with this section, the Secretary shall encourage and assist the States to develop sign controls and programs which will assure that necessary directional information about facilities providing goods and services in the interest of the traveling public will continue to be available to motorists. To this end the Secretary shall restudy and revise as appropriate existing standards for directional signs authorized under subsections 131(c)(1) and 131(f) to develop signs which are functional and esthetically compatible with their surroundings. He shall employ the resources of other Federal departments and agencies, including the National Endowment for the Arts, and employ

maximum participation of private industry in the development of standards and systems of signs developed for those purposes.

(2) Among other things the Secretary shall encourage States to adopt programs to assure that removal of signs providing necessary directional information, which also were providing directional information on June 1, 1972, about facilities in the interest of the traveling public, be deferred until all other nonconforming signs are removed.

(r) Removal of illegal signs.--

(1) By owners.--Any sign, display, or device along the Interstate System or the Federal-aid primary system which was not lawfully erected, shall be removed by the owner of such sign, display, or device not later than the 90th day following the effective date of this subsection.

(2) By States.--If any owner does not remove a sign, display, or device in accordance with paragraph (1), the State within the borders of which the sign, display, or device is located shall remove the sign, display, or device. The owner of the removed sign, display, or device shall be liable to the State for the costs of such removal. Effective control under this section includes compliance with the first sentence of this paragraph.

(s) Scenic byway prohibition.--If a State has a scenic byway program, the State may not allow the erection along any highway on the Interstate System or Federal-aid primary system which before, on, or after the effective date of this subsection, is designated as a scenic byway under such program of any sign, display, or device which is not in conformance with subsection (c) of this section. Control of any sign, display, or device on such a highway shall be in accordance with this section. In designating a scenic byway for purposes of this section and section 1047 of the Intermodal Surface Transportation Efficiency Act of 1991, a State may exclude from such designation any segment of a highway that is inconsistent with the State's criteria for designating State scenic byways. Nothing in the preceding sentence shall preclude a State from signing any such excluded segment, including such segment on a map, or carrying out similar activities, solely for purposes of system continuity.

(t) Primary system defined.--For purposes of this section, the terms "primary system" and "Federal-aid primary system" mean the Federal-aid primary system in existence on June 1, 1991, and any highway which is not on such system but which is on the National Highway System.

### United States Code of Federal Regulations, Chapter 23, Section 750.108
### General Provisions
### (23 C.F.R. § 750.108)

No Class 3 or 4 signs may be permitted to be erected or maintained pursuant to § 750.107, and no Class 2 sign may be permitted to be erected or maintained, in any manner inconsistent with the following:

(a) No sign may be permitted which attempts or appears to attempt to direct the movement of traffic or which interferes with, imitates or resembles any official traffic sign, signal or device.

(b) No sign may be permitted which prevents the driver of a vehicle from having a clear and unobstructed view of official signs and approaching or merging traffic.

(c) No sign may be permitted which contains, includes, or is illuminated by any flashing, intermittent or moving light or lights.

(d) No lighting may be permitted to be used in any way in connection with any sign unless it is so effectively shielded as to prevent beams or rays of light from being directed at any portion of the main-traveled way of the Interstate System, or is of such low intensity or brilliance as not to cause glare or to impair the vision of the driver of any motor vehicle, or to otherwise interfere with any driver's operation of a motor vehicle.

(e) No sign may be permitted which moves or has any animated or moving parts.

(f) No sign may be permitted to be erected or maintained upon trees or painted or drawn upon rocks or other natural features.

(g) No sign may be permitted to exceed 20 feet in length, width or height, or 150 square feet in area, including border and trim but excluding supports, except Class 2 signs not more than 50 feet from, and advertising activities being conducted upon, the real property where the sign is located.

# United States Code of Federal Regulations, Chapter 23, Section 750.705
## Effective Control
## (23 C.F.R. § 750.705)

In order to provide effective control of outdoor advertising, the State must:

(a) Prohibit the erection of new signs other than those which fall under § 750.704(a)(1) through (6);

(b) Assure that signs erected under § 750.704(a)(4) and (5) comply, at a minimum, with size, lighting, and spacing criteria contained in the agreement between the Secretary and the State;

(c) Assure that signs erected under § 750.704(a)(1) comply with the national standards contained in subpart B, part 750, chapter I, 23 CFR;

(d) Remove illegal signs expeditiously;

(e) Remove nonconforming signs with just compensation within the time period set by 23 U.S.C. 131 (subpart D, part 750, chapter I, 23 CFR, sets forth policies for the acquisition and compensation for such signs);

(f) Assure that signs erected under § 750.704(a)(6) comply with § 750.710, Landmark Signs, if landmark signs are allowed;

(g) Establish criteria for determining which signs have been erected with the purpose of their message being read from the main-traveled way of an Interstate or primary highway, except where State law makes such criteria unnecessary. Where a sign is erected with the purpose of its message being read from two or more highways, one or more of which is a controlled highway, the more stringent of applicable control requirements will apply;

(h) Develop laws, regulations, and procedures to accomplish the requirements of this subpart;

(i) Establish enforcement procedures sufficient to discover illegally erected or maintained signs shortly after such occurrence and cause their prompt removal; and

(j) Submit regulations and enforcement procedures to FHWA for approval.